IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:24-CV-471-D

| | | |
|---|---|---|
| S.Y. and C.Y., individually, and as<br>guardians of their minor child,<br>C.A.Y., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| SAMPSON COUNTY BOARD OF<br>EDUCATION, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

On May 29, 2024, C.Y. and S.Y, individually, and as guardians of the minor child C.A.Y. (collectively, "plaintiffs") filed a complaint in Sampson County Superior Court against (1) Sampson County Board of Education ("Sampson County"), (2) Jamie King ("King"), in his official capacity as superintendent, (3) Melanie Smith ("Smith"), individually and in her official capacity as principal, (4) Pam Westbrook ("Westbrook"), individually and in her official capacity as assistant principal, (5) Shannon Williams ("Williams"), individually and in her official capacity as school counselor, and Catherine Ruiz ("Ruiz"), individually and in her official capacity as teacher (collectively, "defendants") [D.E. 1-1]. On June 12, 2024, defendants removed the action to this court [D.E. 1]. On June 19, 2024, defendants moved to dismiss the complaint [D.E. 12] and filed a memorandum in support [D.E. 13]. See Fed. R. Civ. P. 12(b)(6). On July 9, 2024, plaintiffs responded in opposition [D.E. 15] and voluntarily dismissed multiple claims in their complaint [D.E. 16]. On July 23, 2024, defendants replied [D.E. 21].

Plaintiffs allege (1) a procedural due process claim under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution and under the North Carolina Constitution, Article 1, Section 15 against Sampson County and King in his official capacity, (2) a substantive due process claim under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution against Smith and Williams in both their official and individual capacities, (3) an equal protection claim under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution against Smith and Williams in their official capacities, (4) a failure-to-train claim under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution against Sampson County, (5) a negligence claim under North Carolina law against Ruiz and Williams in their individual capacities, (6) a negligent infliction of emotional distress claim under North Carolina law against Ruiz and Williams in their individual capacities, and (7) a false imprisonment claim under North Carolina law against Smith and Williams in their individual capacities. See [D.E. 1-1] ¶¶ 160–166, 185–91, 199–243; [D.E. 16] 1. As explained below, the court grants in part defendants' motion to dismiss, dismisses plaintiffs' federal claims, declines to exercise supplemental jurisdiction over plaintiffs' state-law claims, and remands the action to Sampson County Superior Court.

## I.

C.Y. (mother) and S.Y. (father) are the parents of C.A.Y., a six-year-old girl, who was enrolled in special education at Plain View Elementary School ("Plain View") in Sampson County, North Carolina. See Compl. [D.E. 1-1] ¶¶ 1, 3–7. In fall 2022, C.A.Y. attended kindergarten at Plain View until she was asked to leave due to behavioral issues. See id. at ¶ 72. In fall 2023, C.A.Y. again attended kindergarten at Plain View. See id. at ¶ 75.

2

On January 6, 2023, plaintiffs sought an individualized education plan ("IEP") for C.A.Y. See id. at ¶ 76. On January 23, 2023, plaintiffs met with an unknown person and learned that C.A.Y. performed below grade level expectations and could not focus on an academic task for more than a few minutes, even with "constant redirection." Id. at ¶ 77. Smith, Ruiz, and Emily Bullard (a special education teacher) served as the IEP team and recommended a formal evaluation concerning adaptive behavior and speech. See id. at ¶ 78. In March 2023, plaintiffs engaged a psychologist to assess C.A.Y. See id. at ¶ 79. The psychologist diagnosed C.A.Y. with attention deficit hyperactivity disorder combined type ("ADHD") and recommended that C.A.Y.'s teachers put homework assignments in writing, make checklists, keep the school's website up to date concerning homework assignments, speak slowly, provide information in small units, use brain breaks or movement and exercise, and develop a routine for turning in assignments. See id. at ¶¶ 80–81.

On March 14, 2023, Plain View completed a psychological evaluation of C.A.Y. See id. at ¶ 82. On March 31, 2023, with teacher and parental input and information from the psychological evaluations, Plain View developed a written IEP for C.A.Y. See id. at ¶ 83. The IEP recognized C.A.Y.'s needs for specialized instruction in math, speech, language, motor skills, and adaptive behavior. See id. at ¶ 84. Plain View noted that it could not provide "consultation and/or training for school staff to meet the unique needs of C.A.Y." Id. at ¶ 85.

On October 5, 2023, Ruiz reported to Smith that C.A.Y. slapped another student. See id. at ¶ 86. C.A.Y received a 2.6 hour in-school suspension for her actions. See id. at ¶ 89.

On November 6, 2023, C.A.Y. disrupted reading class, refused to cooperate with her teacher, threw markers on the floor, and refused to pick them up. See id. at ¶ 90. C.A.Y. received

3

a 45-minute "calm down" period for her actions. Id. at ¶ 93.

On November 22, 2023, C.A.Y. laid on the floor screaming and crying and spat at a teacher's assistant after she failed to complete an assignment. See id. at ¶ 94. When the administration could not get C.A.Y. under control, her classmates were taken out into the hallway while C.A.Y. was placed in a 30 minute "chill out." Id. at ¶ 97.

On November 27, 2023, C.A.Y. ate chocolate candy, crackers, ham, a Little Debbie coffee cake, and a bag of fruit loops for lunch. See id. at ¶ 98. Shortly after eating, C.A.Y. distracted other students in Ruiz's math class, refused to sit with the group, and pushed Ruiz. See id. Ruiz texted Plain View's office, called C.Y. (who told her to call S.Y.), and called S.Y. See id. After C.A.Y. talked to S.Y., C.A.Y. went to the resource room and received a treat for behaving. See id. Ruiz reported that C.A.Y.'s negative behavior seemed consistently linked to her "HIGH sugar intake at lunch." Id.

On December 4, 2023, C.A.Y. pulled on Ruiz, trying to make her fall. See id. at ¶ 100. A school resource officer intervened and took C.A.Y. on a walk. See id. C.A.Y. returned to the classroom with two lollipops, which Ruiz did not allow her to eat in the classroom. See id. Later, C.A.Y. went to her resource session. See id. C.A.Y. returned from her resource session with chocolate. See id.

On December 5, 2023, C.A.Y. acted "unruly," ripped tape off the floor being used for a class activity, and removed ornaments from the classroom Christmas tree. Id. at ¶ 102. A resource teacher intervened and took C.A.Y. to the resource room. See id. Nonetheless, Westbrook and Williams needed to intervene when C.A.Y. did not calm down. See id. Smith gave C.A.Y. one hour of "chill out" time. Id. at ¶ 105.

4

On February 12, 2024, C.A.Y. refused to attend music class with her resource teacher. See id. at ¶ 106. The resource teacher took C.A.Y. to Smith's office. See id. C.A.Y. crawled and screamed on the office floor and would not listen to Smith, Williams, or Westbrook. See id. Then, C.A.Y. "started hitting adults" and threw markers. Id. Someone called C.Y. See id. Eventually, C.A.Y. went to a conference room for 45 minutes. See id.

On March 19, 2024, C.A.Y. refused to "go to her group" following Ruiz's class. See id. at 109. C.A.Y. threw a pencil, took items off a shelf and threw them across the floor, and screamed. See id. Smith and Williams removed C.A.Y. from the classroom for a 30 minute "chill out." Id. at ¶ 112.

On March 22, 2024, a special education teacher, Pollock, gave C.Y. and S.Y. C.A.Y.'s proposed IEP. See id. at ¶¶ 142–48. On March 28, 2024, the IEP became effective. See id. at ¶ 146.

On March 27, 2024, C.A.Y. sat in class screaming and crying. See id. at ¶ 113. Smith and a teacher called C.Y., who failed to calm C.A.Y. See id. Smith and a social worker moved C.A.Y. to a small classroom, where she continued to scream, kick the social worker, and cry. See id. As a result, Smith told C.Y. to pick C.A.Y. up from school. See id.

On April 10, 2024, at 1:10 PM, C.A.Y. came nearly nose-to-nose with Ruiz and asked, "What are you going to do?" Id. at ¶ 116. C.A.Y. threw pens and pencils off Ruiz's desk. See id. Ruiz convinced C.A.Y. to return to her desk. See id. Ruiz walked with C.A.Y. to C.A.Y.'s desk. See id. C.A.Y. began trying to kick Ruiz. See id. In order to calm C.A.Y., Ruiz asked C.A.Y. to make good choices or draw a picture. See id. While C.A.Y. was distracted, Ruiz sought support from another teacher or staff. See id. While Ruiz stood in the door, C.A.Y. suddenly charged at

5

her. See id. A fellow school employee, Mrs. Parsons, thwarted C.A.Y.'s attack and took C.A.Y. out of the classroom on a walk. See id. At 1:15 PM, someone called C.Y. to pick up C.A.Y. from school. See id. at ¶ 115. When C.Y. picked up C.A.Y., she noticed an abrasion on C.A.Y. from her right temple to her cheek. See id. at ¶ 123. Smith informed C.Y. that C.A.Y. scratched herself. See id. at ¶ 124. C.A.Y. told C.Y. Smith shoved her into a wall, picked her up by her arms, and placed her in a closet. See id. at ¶¶ 125–26. C.A.Y. also had bruises on her arms and legs. See id. at ¶ 127.

On April 11, 2024, C.Y. confronted Smith concerning C.A.Y's allegations. See id. at ¶ 129. Smith denied pushing C.A.Y. See id. at ¶ 130. C.Y. demanded to see footage from Plain View's cameras. See id. at ¶ 131. Smith denied that Plain View had cameras. See id. C.Y. called the sheriff. See id. at ¶ 133. The Sampson County Sheriff's Office found a camera and footage at Plain View. See id. at ¶¶ 133–34. The camera footage showed Smith and Williams carrying C.A.Y. by her arms and legs and placing her in an unlocked closet for approximately five minutes. See id. at ¶¶ 115–16, 126, 135.

C.A.Y. received a one hour in-school detention for her behavior on April 10, 2024. See id. at ¶ 119. On April 18, 2024, Plain View gave C.Y. and S.Y. copies of the office referral for this incident. See id. at ¶ 121.

On April 17, 2024, C.A.Y entered the physical education classroom late and began yelling. See id. at ¶ 137. Eventually, C.A.Y. began a cup-stacking activity like her classmates. See id. After ten minutes, C.A.Y. refused to continue cup stacking and knocked over her cups. See id. Anna Naylor, the gym teacher, took C.A.Y's cups away. See id. C.A.Y. began shouting. See id. Eventually, another teacher escorted the rest of the class out of the gym, where C.A.Y. remained

6

screaming. See id. Eventually, C.A.Y. calmed down. See id. Someone at Plain View called C.Y. to pick up C.A.Y. See id. C.Y. received a 2.6-day out-of-school suspension for this incident. See id. at ¶ 138. While Plain View stated this was C.A.Y.'s fourth disciplinary incident, C.Y. claimed she never received notices. See id. at ¶¶ 139–40. Plain View again provided the notices to C.Y. See id. at ¶¶ 140–41.

Plaintiffs allege that physical restraint and seclusion of C.A.Y. violate C.A.Y.'s IEP, section 504, and C.A.Y.'s behavior intervention plan. Plaintiffs also allege that defendants used unreasonable force against C.A.Y. See id. at ¶¶ 149–50.

## II.

Plaintiffs brings some claims against Sampson County and some claims against Sampson County employees in both their individual and official capacities. A claim against a public official sued in his or her official capacity is essentially a claim against the government entity the official represents. See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). Thus, plaintiffs' procedural due process claim against King in his official capacity in count one, the substantive due process claim against Smith and Williams in their official capacities in count two, and the equal protection claim against Smith and Williams in their official capacities in count three are functionally brought against Sampson County. See Hafer v. Melo, 502 U.S. 21, 25 (1991); Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469 (4th Cir. 2013). Accordingly, the court dismisses plaintiffs' official capacity claim against King in count one, their official capacity claim against Smith and Williams in count two, and their official capacity claim against Smith and Williams in count three.

7

# III.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [her] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus.,

8

Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts. Ltd., 551 U.S. 308, 322 (2007); Phillips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Plaintiffs allege numerous section 1983 claims, including a procedural due process claim against Sampson County, a substantive due process claim against Smith and Williams in both their official and individual capacities, an equal protection claim against Smith and Williams in their official capacities, and a failure-to train claim against Sampson County. See Compl. ¶¶ 160–66, 185–91, 199–220. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see City of Escondido v. Emmons, 586 U.S. 38, 42–44 (2019) (per curiam); Kisela v. Hughes, 584 U.S. 100, 103–08 (2018) (per curiam); District of Columbia v. Wesby, 583 U.S. 48, 62–63 & n.7 (2018); Hernandez v. Mesa, 582 U.S. 548, 554 (2017) (per curiam); Ziglar v. Abbasi, 582 U.S. 120, 150–51 (2017); Mullenix v. Luna, 577 U.S. 7, 11–13 (2015) (per curiam); Taylor v. Barkes, 575 U.S. 822, 825–27

9

(2015) (per curiam); City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 611 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam); Reichle v. Howards, 566 U.S. 658, 664 (2012); Camreta v. Greene, 563 U.S. 692, 707 (2011); Pearson v. Callahan, 555 U.S. 223, 236 (2009); King v. Riley, 76 F.4th 259, 264–68 (4th Cir. 2023); Sharpe v. Winterville Police Dep't, 59 F.4th 674, 682–84 (4th Cir. 2023); Burns-Fisher v. Romero-Lehrer, 57 F.4th 421, 424 (4th Cir. 2023); Tobey v. Jones, 706 F.3d 379, 385 (4th Cir. 2013). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Kisela, 584 U.S. at 103–04; Wesby, 583 U.S. at 63; Ziglar, 582 U.S. at 151–52; White v. Pauly, 580 U.S. 73, 79–80 (2017); Mullenix, 577 U.S. at 12; Taylor, 575 U.S. at 825; Sheehan, 575 U.S. at 611; Carroll, 574 U.S. at 17.

In analyzing qualified immunity, the court asks (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Pearson, 555 U.S. at 232 (quotations omitted); see Wood v. Moss, 572 U.S. 744, 757 (2014); Lewis v. Carabello, 98 F.4th 521, 530 (4th Cir. 2024); Knibbs v. Momphard, 30 F.4th 200, 214 (4th Cir. 2022); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). The qualified-immunity analysis need not proceed in a particular sequence, and the court may exercise its "sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236; see King, 76 F.4th at 265. Qualified immunity shields a defendant if the answer to either prong is "no." See Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011);

10

Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir. 2007), abrogated on other grounds by Pearson, 555 U.S. 223; Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." al-Kidd, 563 U.S. at 741 (cleaned up); see Rivas-Villegas v. Cortesluna, 595 U.S. 1, 4–5 (2021) (per curiam); King, 76 F.4th at 265; Sharpe, 59 F.4th at 682–84. Although a case need not be directly controlling, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741; see Rivas-Villegas, 595 U.S. at 4–6; Reichle, 566 U.S. at 664; King, 76 F.4th at 266–68; Sharpe, 59 F.4th at 682–84.

To determine whether a government official's conduct violates clearly established law, a court must first specifically define the right. See, e.g., City of Tahlequah v. Bond, 595 U.S. 9, 12–13 (2021) (per curiam). Then, based on that specifically defined right, the court must determine whether existing precedent placed the statutory or constitutional question "beyond debate." Kisela, 584 U.S. at 104 (quotation omitted). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Bond, 595 U.S. at 12 (quotation omitted); see Wesby, 583 U.S. at 63. A government official is entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." Kisela, 584 U.S. at 104 (quoting Luna, 577 U.S. at 13); Wesby, 583 U.S. at 63–66. Nonetheless, courts should not "assume that government officials are incapable of drawing logical inferences, reasoning by

11

analogy, or exercising common sense. Harris v. Town of S. Pines, 110 F.4th 633, 644 (4th Cir. 2024) (quotation omitted).

The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." Wesby, 583 U.S. at 66 n.8; see Kisela, 584 U.S. at 103–08; Taylor, 575 U.S. at 825–27; Sheehan, 575 U.S. at 613–14; Carroll, 574 U.S. at 16–17. In the Fourth Circuit, existing precedent includes precedent of the United States Supreme Court, the Fourth Circuit, and the highest court of the state in which the action arose. See, e.g., Sharpe, 59 F.4th at 683; Dean for & on behalf of Harkness v. McKinney, 976 F.3d 407, 417 (4th Cir. 2020); Doe ex rel. Johnson, 597 F.3d at 176; Wilson v. Kitte, 337 F.3d 392, 402–03 (4th Cir. 2003) abrogated on other grounds by Pearson, 555 U.S. 22. It also includes "a consensus of persuasive authority from other jurisdictions." Sharpe, 59 F.4th at 683.

## A.

In count one, plaintiffs allege that Sampson County violated C.A.Y.'s procedural due process rights by not providing an opportunity for a review or appeal of her short-term suspension. See Compl. ¶¶ 160–66; cf. U.S. Const. amend. XIV § 1. "The procedural component of due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." D.B. v. Cardall, 826 F.3d 721, 741 (4th Cir. 2016) (quotation omitted). To state a procedural due process claim, a plaintiff must plausibly allege that some state action deprived her of a constitutionally protected liberty or property interest without adequate procedural safeguards. See Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013). This inquiry involves two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second

12

examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989) (citations omitted); Sansotta, 724 F.3d at 540.

"Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States." Thompson, 490 U.S. at 460. Protected property interests, on the other hand, derive not from the Constitution but from "existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972); see Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); Bishop v. Wood, 426 U.S. 341, 344 (1976). Regardless of the interest claimed, "an individual claiming a protected interest must have a legitimate claim of entitlement to it," as opposed to "an abstract need or desire" or a "unilateral hope." Thompson, 490 U.S. at 460 (quotations and citations omitted); see Pittman v. Wilson Cnty., 839 F.2d 225, 227 (4th Cir. 1988).

A public school student in North Carolina has a property interest in a free public education, and "the temporary suspension of a public school student implicates [the student's] right to due process under the Fourteenth Amendment." E.W. v. Wake Cnty. Bd. of Educ., No. 5:09-CV-198, 2010 WL 1286215, at *7 (E.D.N.C. Feb. 16, 2010) (unpublished), report and recommendation adopted in part, No. 5:09-CV-198, 2010 WL 1286218 (E.D.N.C. Mar. 30, 2010) (unpublished); see Goss v. Lopez, 419 U.S. 565, 581 (1975); Brattain v. Stanly Cnty. Bd. of Educ., No. 1:19CV1037, 2020 WL 6364718, at *4 (M.D.N.C. Oct. 29, 2020) (unpublished). "[D]ue process requires, in connection with a suspension of [ten] days or less, that the student be given oral or written notice of the charges against [her,] and[] if [she] denies them, an explanation of the evidence the authorities have and an opportunity to present [her] side of the story." Goss, 419 U.S.

13

at 581. "In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." Id. at 582. Nonetheless, "recurring situations arise" in which the Fourteenth Amendment does not require "prior notice and hearing." Id. For example, a student "whose presence poses . . . an ongoing threat of disrupting the academic process may be immediately removed from school." Id. In such a case, "the necessary notice and rudimentary hearing should follow as soon as practicable." Id. at 582–83.

Under the North Carolina Constitution, "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. Generally, "no short-term suspension shall be imposed upon a student without first providing the student an opportunity for an informal hearing with the principal." N.C. Gen. Stat. § 115C-390.6(a). "The principal may impose a short-term suspension without providing the student an opportunity for a hearing," however, if the presence of the student "substantially disrupts or interferes with the education of other students or the maintenance of discipline at the school." Id. § 115C-390.6(b). In these cases, "the notice of the charges and informal hearing . . . shall occur as soon as practicable." Id. After the imposition of the short-term suspension, "[t]he principal shall provide notice to the student's parent[s] of any short-term suspension, including the reason for the suspension and a description of the alleged student conduct upon which the suspension is based." Id. § 115C-390.6(c). "The notice shall be given by the end of the workday during which the suspension is imposed when reasonably possible, but in no event more than two days after the suspension is imposed." Id. "The notice shall be given by certified mail, telephone, facsimile, e-mail, or any other method reasonably designed to achieve actual notice." Id. "In the final analysis, the balance of rights and interests to be struck in the disciplinary process is a task best left to local

14

school systems, operating, as they do, within the parameters of state law." Wofford v. Evans, 390 F.3d 318, 324 (4th Cir. 2004); see E.W., 2010 WL 1286215, at *8.

Plaintiffs allege that Sampson County denied C.A.Y. a process to appeal her short-term suspensions and thereby failed to provide procedural due process. See Compl. ¶ 163–64; [D.E. 15] 6–9. Under North Carolina law, however, an appeal process existed that plaintiffs failed to pursue. See N.C. Gen. Stat. § 115C-45(c)(1–2); Hensley v. Johnston Cnty. Bd. of Educ., No. 5:07-CV-231, 2010 WL 5437240, at *11–12 (E.D.N.C. Dec. 23, 2010) (unpublished); Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 789, 688 S.E.2d 426, 429 (2010). Thus, plaintiffs fail to plausibly allege that Sampson County violated C.A.Y.'s procedural due process rights. Accordingly, the court dismisses plaintiffs' claim in count one under section 1983 and the Fourteenth Amendment. In light of this conclusion, the court need not address defendants' argument under Monell v. Department of Social Services, 436 U.S. 658 (1978).

### B.

In count four, plaintiffs allege Smith and Williams in both their official and individual capacities violated C.A.Y.'s substantive due process rights. See Compl. ¶¶ 185–91. "[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." Youngberg v. Romeo, 457 U.S. 307, 316 (1982) (quotation omitted); see Washington v. Glucksberg, 521 U.S. 702, 719 (1997); Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980). Restraint cases require balancing an individual's liberty interest against a state interest in using the restraint. See Youngberg, 457 U.S. at 320–24; H.H. ex rel. H.F. v. Moffett, 335 F. App'x 306, 313 (4th Cir. 2009) (unpublished). The question is

15

not simply whether restraint infringes a liberty interest, "but whether the extent or nature of the restraint" violates due process. Youngberg, 457 U.S. at 320.

Under North Carolina law, "physical restraint" means "the use of physical force to restrict the free movement of all or a portion of a student's body." N.C. Gen. Stat. § 115C-391.1(b)(8). Physical restraint of students by school personnel is reasonable in certain circumstances including:

> a. As reasonably needed to obtain possession of a weapon or other dangerous objects on a person or within the control of a person.
> b. As reasonably needed to maintain order or prevent or break up a fight.
> c. As reasonably needed for self-defense.
> d. As reasonably needed to ensure the safety of any student, school employee, volunteer, or other person present, to teach a skill, to calm or comfort a student, or to prevent self-injurious behavior.
> e. As reasonably needed to escort a student safely from one area to another.
> f. If used as provided for in a student's IEP or Section 504 plan or behavior intervention plan.
> g. As reasonably needed to prevent imminent destruction to school or another person's property.

Id. § 115C-391.1(c)(1). "Except as set forth in [N.C. Gen. Stat. § 115C-391.1(c)(1)], physical restraint of students shall not be considered a reasonable use of force, and its use is prohibited." Id. § 115C-391.1(c)(2). Likewise, "[p]hysical restraint shall not be considered a reasonable use of force when used solely as a disciplinary consequence." Id. § 115C-391.1(c)(2).

Under North Carolina law, "seclusion" means "the confinement of a student alone in an enclosed space" from which the student is either "[p]hysically prevented from leaving by locking hardware or other means" or "[n]ot capable of leaving due to physical or intellectual incapacity." Id. § 115C-391.1(b)(10). "Time-out" means "a behavior management technique in which a student is separated from other students for a limited period of time in a monitored setting." Id. § 115C-391.1(b)(11).

Plaintiffs allege that on March 19, 2024, March 27, 2024, and April 10, 2024, Smith and Williams physically restrained and removed C.A.Y. from multiple classrooms and placed her in seclusion in violation of her substantive due process rights. See Compl. ¶¶ 187–89. On March 19, 2024, C.A.Y. refused to "go to her group" following Ruiz's class. See id. at ¶ 109. C.A.Y. threw a pencil, took items off a shelf and threw them across the floor, and screamed. See id. Smith and Williams removed C.A.Y. from the classroom using physical restraint for a 30 minute "chill out." Id. at ¶¶ 112, 168. Plaintiffs allege that this physical restraint was not necessary to "ensure the safety of another." Id. at ¶ 169. When C.A.Y. threw pencils and items from the shelves, however, C.A.Y. endangered everyone in the classroom. Moreover, C.A.Y.'s behavior rose to the level of criminal misdemeanor assault. See N.C. Gen. Stat. § 14-33. Furthermore, Smith and Williams took C.A.Y. to another classroom and remained there with her. See Compl. ¶¶ 112, 168. C.A.Y.'s separation from her peers does not constitute "seclusion" under North Carolina law. See N.C Gen. Stat. § 115C-391.1(b)(10). Moreover, "time-out" is permitted. See id. § 115C-391.1(b)(11). Accordingly, plaintiffs fail to plausibly allege that the March 19, 2024 incident involved unlawful physical restraint in violation of section 1983 and the Fourteenth Amendment.

On March 27, 2024, C.A.Y. sat in class screaming and crying. See Compl. ¶¶ 113. Smith and another teacher called C.Y., who failed to calm C.A.Y. See id. Smith and a social worker then moved C.A.Y. to a small classroom, where C.A.Y. continued to scream, kick the social worker, and cry. See id. As a result of C.A.Y.'s behavior, Smith told C.Y. to pick C.A.Y. up from school. See id.

To maintain order, a teacher may remove a screaming and crying child from the classroom. See N.C. Gen. Stat. § 115C-391.1(f). C.A.Y.'s actions on March 19, 2024, permitted the inference

17

that she would again engage in violent behavior. On March 27, 2024, C.A.Y. did act violently when she repeatedly kicked the social worker. See id. at ¶ 113. Furthermore, Smith and the social worker removed C.A.Y. to a different classroom and remained there with her. See id. C.A.Y.'s separation from her peers does not rise to the legal standard for "seclusion" under North Carolina law. See N.C Gen. Stat. § 115C-391.1(b)(10). Moreover, "time-out" is permitted. See id. § 115C-391.1(b)(11). Accordingly, plaintiffs fail to plausibly allege that the March 27, 2024 incident involved unlawful physical restraint in violation of section 1983 and the Fourteenth Amendment.

On April 10, 2024, at 1:10 PM, C.A.Y. was upset and came nearly nose-to-nose with Ruiz and asked, "What are you going to do?" Compl. ¶ 116. C.A.Y. then threw pens and pencils off Ruiz's desk. See id. Ruiz convinced C.A.Y. to return to her desk, and Ruiz tried to walk C.A.Y. to her desk. See id. C.A.Y., however, began trying to kick Ruiz. See id. In an effort to calm C.A.Y., Ruiz asked C.A.Y. to make good choices and draw a picture. See id. With C.A.Y. distracted, Ruiz sought support from another teacher or staff. See id. As Ruiz stood in the door, C.A.Y. suddenly charged at Ruiz. See id. Mrs. Parsons thwarted C.A.Y.'s attack and took C.A.Y. out of the classroom for a walk. See id. At some point, Smith and Williams carried C.A.Y. by her arms and legs and placed C.A.Y. in an unlocked closet for approximately five minutes. See id. at ¶¶ 115–16, 126, 135.

Given that C.A.Y. attempted to kick Ruiz and charged at her, Ruiz could remove C.A.Y. to ensure Ruiz's safety and the safety of the other children. As for seclusion, Smith and Williams placed C.A.Y. alone in an unlocked closet for approximately five minutes. See id. at ¶¶ 126, 135. Even viewing the compliant in the light most favorable to plaintiffs, plaintiffs fail to plausibly allege that Smith or Williams locked C.A.Y. in the closest or physically prevented C.A.Y. from

18

leaving the closet. Cf. N.C Gen. Stat. § 115C-391.1(b)(10). Accordingly, plaintiffs fail to plausibly allege that on April 10, 2024, Smith or Williams unlawfully used physical restraint to violate C.A.Y.'s rights under section 1983 and the Fourteenth Amendment.

Alternatively, even if Smith and Williams violated C.A.Y.'s rights under the Fourteenth Amendment by placing her in an unlocked closet for approximately five minutes, plaintiffs fail to plausibly allege that Smith and Williams's conduct violated clearly established law under the Fourteenth Amendment. The Fourth Circuit has held "that a reasonable teacher would know that maliciously restraining a child in her chair for hours at a time interferes with that child's constitutional liberty interests." Moffett, 335 F. App'x at 314 (emphasis added); see Hall, 621 F.2d at 613. The Supreme Court, however, recognizes that some restraint is acceptable. See Youngberg, 457 U.S. at 323. Even viewing plaintiffs' complaint in the light most favorable to them, plaintiffs fail to plausibly allege Smith and Williams violated plaintiffs' clearly established rights under the Fourteenth Amendment. Tellingly, plaintiffs cite no case from the United States Supreme Court, the North Carolina Supreme Court, or the Fourth Circuit that would have placed Smith and Williams's conduct "beyond debate." Kisela, 584 U.S. at 104 (quotation omitted); see Bond, 595 U.S. at 12; Wesby, 583 U.S. at 63. Simply put, Moffett is distinguishable, and "existing precedent" did not "squarely govern the specific facts at issue." Kisela, 584 U.S. at 104 (cleaned up); Mullenix, 577 U.S. at 13; Wesby, 583 U.S. at 63–66. In reaching this conclusion, the court does not condone placing an upset and unruly elementary school child in an unlocked closet for approximately five minutes. Rather, the court "faithfully" applies "binding" qualified immunity precedent despite the qualified immunity precedent being "controversial" and "criticized." King, 76 F.4th at 270. Thus, the court dismisses plaintiffs' substantive due process claim in count four.

19

## C.

Plaintiffs allege Smith and Williams in their official capacities violated C.A.Y.'s equal protection rights. See Compl. ¶¶ 199–206. Specifically, plaintiffs allege that Smith and Williams punished C.A.Y. for disrupting class, throwing pencils and markers, screaming and crying, spitting, and hitting and kicking Williams because she has special needs. See id. at ¶¶ 204–05.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To establish an equal protection claim, a plaintiff must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001) (citation omitted). Purposeful discrimination "implies that the decisionmaker . . . selected or affirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979). If a plaintiff demonstrates intentional unequal treatment, the court must then determine whether the treatment is "justified under the requisite level of scrutiny." Morrison, 239 F.3d at 654.

Under North Carolina law, spitting on, hitting, or kicking another person constitutes misdemeanor assault. See N.C. Gen. Stat. § 14-33; A.G. v. Fattaleh, 614 F. Supp. 3d 204, 226 (W.D.N.C. 2022). Plaintiffs fail to plausibly allege that Sampson County treated C.A.Y. differently from any students with or without special needs who similarly disrupted class, threw objects, and assaulted others during school. See, e.g., Harmon v. Cumberland Cnty Bd. of Educ., 186 F. Supp. 3d 500, 507 (E.D.N.C. 2016). Thus, plaintiffs fail to plausibly allege that Sampson County

20

violated C.A.Y.'s equal protection rights. Accordingly, the court dismisses count six, and the court need not address defendants' Monell argument.

### D.

In count seven, plaintiffs allege a failure-to train claim against Sampson County. See Compl. ¶¶ 207–20. The alleged failure to train concerns training school personnel about children with special needs. See id.

A municipality is not vicariously liable for constitutional injuries inflicted by its employees. See, e.g., Monell, 436 U.S. at 691; Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). In certain narrow circumstances, however, a municipality may be liable under section 1983 for failure to adequately train or supervise its employees. See, e.g., Connick v. Thompson, 563 U.S. 51, 59–63 (2011); Harris, 489 U.S. at 388–92. To establish such a claim, a plaintiff must prove that (1) a municipality employee actually violated the plaintiff's constitutional or statutory rights, (2) the municipality's failure to properly train or supervise the subordinates amounts to "deliberate indifference" to the rights of the plaintiff, and (3) this failure to train or supervise actually caused the subordinates to violate the plaintiff's rights. Connick, 563 U.S. at 59–63; see Canton, 489 U.S. at 388–92; Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000); Spell v. McDaniel, 824 F.2d 1380, 1389–90 (4th Cir. 1987); Brown v. Frazier, No. 4:12-CV-290, 2013 WL 5739091, at *2–3 (E.D.N.C. Oct. 22, 2013) (unpublished); Cooper v. Brunswick Cnty. Sheriff's Dep't, 896 F. Supp. 2d 432, 451–53 (E.D.N.C. 2012); Smith v. Atkins, 777 F. Supp. 2d 955, 966–67 (E.D.N.C. 2011). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." Connick, 563 U.S. at 62 (quotation omitted); see Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983) (collecting cases).

21

Because plaintiffs do not plausibly allege an underlying constitutional violation, plaintiffs' failure-to-train claim in count seven fails. See, e.g., City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Waybright v. Frederick Cnty., 528 F.3d 199, 209 (4th Cir. 2008); Wilson v. Flynn, 429 F.3d 465, 469 n.* (4th Cir. 2005); Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999), abrogated on other grounds by Kingsley v. Hendrickson, 576 U.S. 398 (2015); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990).

Alternatively, count seven fails because plaintiffs do not plausibly allege that Sampson County caused a constitutional deprivation through an official policy or custom. See, e.g., Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403–04 (1997); Monell, 436 U.S. at 694; Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). Notably, not every municipal official's action or inaction represents municipal policy. Rather, the inquiry focuses on whether the municipal official possessed final policymaking authority with respect to the action or inaction. See, e.g., Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); Riddick v. Sch. Bd., 238 F.3d 518, 523 (4th Cir. 2000). Furthermore, even if a section 1983 plaintiff can identify the requisite final authority, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." Riddick, 238 F.3d at 524. Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404 (emphasis removed); Harris, 489 U.S. at 389; Riddick, 238 F.3d at 524. Hence, in order to avoid imposing respondeat superior liability on municipalities, a section 1983 plaintiff must plausibly allege that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right

22

will follow the decision." Brown, 520 U.S. at 411; see Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218.

"Deliberate indifference is a very high standard — a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695. Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action [or inaction]." Brown, 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite culpability, a section 1983 plaintiff also must show "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404. Deliberate indifference and causation are separate requirements. Id.

Plaintiffs have failed to plausibly allege in count seven final policymaking authority or deliberate indifference. See, e.g., id.; Riddick, 238 F.3d at 524–26. Thus, count seven fails.

Alternatively, plaintiffs have failed to plausibly allege a "direct causal link" between "a specific deficiency in training and the particular violation alleged." Buffington v. Baltimore County, 913 F.2d 113, 122 (4th Cir. 1990). It does not suffice to allege "that an injury . . . could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" because "[s]uch a claim could be made about almost any encounter." Harris, 489 U.S. at 391. Instead, a plaintiff must plausibly allege specific training deficiencies and either (1) that inadequately trained employees engaged in a pattern of unconstitutional conduct, or (2) that a violation of a federal right is a "highly predictable consequence of a failure to equip [government] officers with specific tools to handle recurring situations." Brown, 520 U.S. at 407–09; see Harris, 489 U.S. at 391; Cornfield v. Consol. High Sch. Dist. No. 230, 991 F.2d 1316, 1327 (7th Cir. 1993); Hill v. Robeson Cnty., 733 F. Supp. 2d

23

676, 686–88 (E.D.N.C. 2010). In the second situation, the need for "more or different training" must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 390.

Plaintiffs have not plausibly alleged any specific training deficiencies or a pattern of unconstitutional conduct. See, e.g., Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (plurality opinion); Broderick, 225 F.3d at 456; Semple v. City of Moundsville, 195 F.3d 708, 713–14 (4th Cir. 1999); Spell, 824 F.2d at 1391. Likewise, nothing in plaintiffs' complaint suggests that a violation of the Fourteenth Amendment is a highly predictable consequence of Sampson County's current policies and training concerning children with special needs. See, e.g., Davis v. Scherer, 468 U.S. 183, 194–96 (1984); Minix v. Canarecci, 597 F.3d 824, 834 (7th Cir. 2010). Accordingly, the court dismisses count seven.

## IV.

The court has jurisdiction under 28 U.S.C. § 1331 over the federal claims. The court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims.

A court may decline to exercise supplemental jurisdiction over a state-law claim when (1) "the claim raises a novel or complex issue of State law;" (2) "the claim substantially predominates over" the federal claim or claims; (3) the court has "dismissed all claims over which it has original jurisdiction;" or (4) other "exceptional circumstances" present "compelling reasons for declining jurisdiction." 28 U.S.C. §§ 1367(c)(1)–(4). Additionally, a court may decline to exercise supplemental jurisdiction when "values of economy, convenience, fairness, and comity" make retaining jurisdiction inappropriate. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 351 (1988),

24

superseded on other grounds by 28 U.S.C. § 1447(c); see Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 616–17 (4th Cir. 2001); Shanaghan v. Cahill, 58 F.3d 106, 109–10 (4th Cir. 1995).

The court has dismissed all federal claims. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon, 484 U.S. at 350 n.7; see Shanaghan, 58 F.3d at 110. Accordingly, the court declines to exercise supplemental jurisdiction over plaintiffs' state-law claims and dismisses those claims without prejudice. See Carnegie-Mellon, 484 U.S. at 350 n.7.

### V.

In sum, the court GRANTS IN PART defendants' motion to dismiss [D.E. 12], DISMISSES plaintiffs' federal claims, DECLINES to exercise supplemental jurisdiction over plaintiffs' state-law claims, and REMANDS the action to Sampson County Superior Court.

SO ORDERED. This 31 day of October, 2024.

JAMES C. DEVER III
United States District Judge

25